

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**TAWANA C. MARSHALL, CLERK**
**THE DATE OF ENTRY IS**
**ON THE COURT'S DOCKET**



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed June 29, 2011**

___

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HYANG RAN HWANG, | § | Case No. 10-35048-SGJ-7 |
|     Debtor. | § | (Chapter 7) |
| _____ | § | |
| | § | |
| PROSPER BANK, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 10-03290 |
| | § | |
| COMERICA BANK, N.A., et al., | § | |
|     Defendants. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
IN SUPPORT OF JUDGMENT DECLARING: (A) INAPPLICABILITY OF
EQUITABLE SUBROGATION DOCTRINE AS TO PROSPER BANK; AND (B)
PRIORITY OF LIEN OF COMERICA BANK**

CAME ON BEFORE THIS COURT, on June 20, 2011, a Trial in the above-referenced adversary proceeding ("Adversary Proceeding"). The following constitutes the court's findings of fact and conclusions of law, pursuant to F.R.B.P. 7052, after the court's

-1-

deliberation on the evidence. Where appropriate, a finding of fact shall be construed as a conclusion of law and *vice versa*. The court reserves the right to make further findings of fact and conclusions of law, as necessary.

## I. INTRODUCTION

This Adversary Proceeding involves a lien priority dispute between Prosper Bank ("Prosper") and Comerica Bank ("Comerica") as to certain land that is or was owned by the Chapter 7 Debtor ("Mr. Hwang") and his wife (collectively, the "Hwangs"). Specifically, Prosper seeks a declaratory judgment that it has a senior lien to Comerica in certain real property that has been referred to in the evidence as "Lot 3" in an area known as Block D/2663 of the Beeman Estates, an addition to the City of Dallas, Dallas County, Texas (which property is on Samuel Boulevard near Owenwood Avenue). Prosper also seeks a declaration that it may foreclose on its alleged superior lien on Lot 3. Prosper and Comerica are the sole remaining parties in the Adversary Proceeding.[1]

## II. FINDINGS OF FACT

A. The Various Real Property Owned by the Debtor and His Wife (*i.e.*, the Hwangs).

    1. The Hwangs purchased the so-called Lot 3, along with an

---

[1] The Debtor, his wife, and the Chapter 7 Trustee were originally named as Defendants in this Adversary Proceeding but have chosen not to answer or take a position in this dispute.

adjacent Lot 4, of Block D/2663 of the Beeman Estates in Dallas County, Texas on August 5, 1998 for $175,000.  Ex. A (Warranty Deed With Vendor's Lien, showing recordation in Dallas County, Texas on August 27, 1998).

2.   The Hwangs also, at some point, acquired a Lot 5 and 6 that were further adjacent to Lot 4 (although the evidence at Trial did not indicate when Lots 5 and 6 were acquired by the Hwangs).  Ex. H.

3.   It is the so-called Lot 3 that is the relevant parcel of real property that is in controversy in this Adversary Proceeding.

B.   The UCB Loan to the Hwangs, Individually

4.   On or about December 17, 1999, the Hwangs, as individuals, borrowed $300,000 from United Central Bank ("UCB" and, when referring to the loan, the "UCB Loan").  The Hwangs executed a Deed of Trust to secure the UCB Loan with a lien on Lots 3 and 4.  Ex. B.

5.   UCB recorded its Deed of Trust, putting the world on notice of its lien in Lots 3 and 4, in the Dallas County Real Property Records, on January 13, 2000.  Ex. B.

C.   The Wilshire/SBA Loan to A&S Grapevine Group, Inc.:  A Corporation Owned by the Hwangs

6.   A&S Grapevine Group, Inc. ("A&S") was a separate corporate entity that was owned by the Hwangs.

7. On or about March 28, 2005, Wilshire State Bank ("Wilshire") issued a Small Business Administration ("SBA") Loan (the "Wilshire/SBA Loan") to A&S in the amount of $1,600,000.00. Ex. C, pp. 14 & 20.[2] Apparently, the purpose of the loan was for construction. Ex. C, p. 14. Also, a section entitled "Purpose of the Loan" in the Construction Deed of Trust states that the note proceeds will be used by A&S "to discharge corporate debts." Ex. C, p. 14. In any event, it was an aspect of the Wilshire/SBA Loan that the lender would be granted a lien in **Lots 4, 5, and 6** of the Beeman Estates. Ex. C, p, 14. There was **no mention of Lot 3** in the Wilshire/SBA Loan documents.

8. Recall that the Hwangs **personally** owned Lots 3, 4, 5, and 6. But **A&S was the borrower and pledger** under the Wilshire/SBA Loan. So how were the mechanics of this pledge handled? On March 28, 2005, the Hwangs transferred Lots 4, 5, & 6 (**but not Lot 3**) to A&S. Ex. E (General Warranty Deed).[3]

9. Recall that UCB had a lien on Lots 3 and 4. The

---

[2] The parties stipulated that the Wilshire/SBA Loan was made on March 28, 2005, but the Ex. C admitted into evidence shows the date of the loan as March 23, 2005, although the borrower A&S appears to have signed the loan documents on March 28, 2005. Ex. C is actually a Construction Deed of Trust that mentions the underlying loan. The actual note evidencing the Wilshire/SBA Loan was not submitted into evidence at Trial, but the court takes judicial notice that such note was attached to the Complaint initiating this Adversary Proceeding as Ex. B, and it is dated March 23, 2005.

[3] The General Warranty Deed reflecting the conveyance of Lots 4, 5, and 6 is actually dated March 24, 2005, but appears to have been signed by the Hwangs on March 28, 2005. Ex. E, pp. 27 & 28.

-4-

evidence showed that, on or about March 29, 2005, UCB executed a Release of Lien as to Lots 3 & 4. Ex. F, p. 31.[4] The court notes that the Release of Lien was prepared somewhat sloppily, in that it showed in typewritten language that UCB was releasing a lien on "Lots 4, 5, and 6," but someone hand-marked through this and further handwrote in "3 & 4 KB" above where "Lots 4, 5, and 6" had been printed. There was no mention of this during the Trial, and it is unclear who "KB" might have been (but, apparently, there is no question of the authenticity of this hand-marking).

    10. On March 30, 2005, all relevant documents pertaining to the Wilshire/SBA Loan to A&S were recorded. Specifically, the Hwangs' General Warranty Deed conveying Lots 4, 5, and 6 to A&S was recorded (at 2:47 p.m.). Ex. E, p. 29. Also, the UCB Release of Lien was recorded (at 2:56 p.m.). Ex. F, p. 32. Then, the Construction Deed of Trust pertaining to Lots 4, 5, & 6, on account of the Wilshire/SBA Loan to A&S was recorded (at 2:57 p.m.). Ex. C, p. 22.

    11. According to a Wilshire witness affidavit executed by a Carolyn A. Mattazaro, who indicates that she holds the title of "SVP & SBA Portfolio Manager" at Wilshire (the "Affidavit"), on ***March 28, 2005***, Wilshire "made a payoff to United Central Bank in

---

[4] The Release of Lien is dated March 21, 2005, but shows that it was executed by UCB (Tom Utecht) on March 29, 2005.

the amount of $175,159.96 when it issued Loan Number 1208549 to A&S Grapevine Group, Inc." The Affidavit references, in support of this statement of the alleged payoff, a one-page attachment to the Affidavit, which attachment is purportedly a portion of a General Ledger kept by Wilshire. The one-page attachment (which is untitled) shows an eight-column chart, which further shows "*5/19/06*" as the apparent date of a $175,159.96 payment, and it appears that such payment actually went to an entity called "Tony's Beer & Wine" (which the court understands may have been affiliated with the Hwangs, but there is no evidence as to this). Ex. D, pp. 24 & 26.

12. While it is hard to conceive that UCB would have released its lien on Lots 3 and 4 owned by the Hwangs, on or about March 29, 2005, without having first received payment in full of the amount UCB was owed on the UCB Loan, ***the fact is that we have no documentary proof (or other credible evidence) that Wilshire/SBA Loan proceeds were, in fact, used to pay off the UCB Loan***. Ex. D (described in the preceding paragraph) is not at all probative on this point. Ex. D, pp. 24 & 26.

D. <u>The Comerica Loan to the Hwangs' Other Corporation Known as Sash.</u>

13. Sash Corporation ("Sash") is a separate corporate entity that was owned by the Hwangs.

14. Approximately three months after the Wilshire/SBA Loan

was made, Comerica made a loan, on June 29, 2005, to Sash in the amount of $1,300,000 (the "Comerica Loan"). On the same day, the Hwangs signed guarantees on the Comerica Loan. These facts were stipulated to by the parties (the Comerica Loan documents were not in evidence).

E.   Miscellaneous Activities After the Wilshire/SBA Loan to A&S and After the Comerica Loan to Sash.

15.  ***Replatting of the Lots***.  Meanwhile, later in the year 2005, after the Wilshire/SBA Loan and after the Comerica Loan, on October 14, 2005, the Hwangs (***who, recall, still owned Lot 3, at this point, but had conveyed Lots 4, 5, and 6 to A&S in March 2005***), filed a replat in the Dallas County, Texas real property records, purporting to transform (for lack of a better term) all four of the lots (Lots 3, 4, 5, and 6) into a single, new "Lot 3A."  Ex. H.  There was no evidence at Trial explaining what the motive for this might have been.  However, there was never any ***conveyance*** of Lot 3 from the Hwangs to A&S.  Thus, the melding of Lots 3-6 into a new "Lot 3A" (if that is what was intended) really made no sense, since Lot 3 was owned by a different owner than Lots 4, 5, and 6.  Lot 3 was not listed in the Debtor's Schedules in this Bankruptcy Case.  Yet, both Prosper and Comerica agreed at Trial that Lot 3 was never actually conveyed by the Debtor and his wife to A&S or any other person/entity.

16.  ***Subsequent Small Wilshire Loan to A&S.***  Roughly a year

after the replatting exercise, on November 3, 2006, it appears that A&S borrowed another $105,000 from Wilshire. *See* Exs. D & E that were attached to Prosper's Complaint, of which the court takes judicial notice (these were ***not*** offered into evidence). Wilshire received a deed of trust in connection with such loan that purported to cover Lot 3A. *See* Complaint ¶14. Again, there was no evidence submitted at Trial of this transaction, although the transaction was alluded to in other evidence. *See* Ex. I, p. 43. The court notes that the copies of the documents that allegedly substantiated this secured loan (that were attached as Exs. D & E to the Complaint), were not recorded copies.

  17. ***Prosper Enters the Picture for the First Time, with a New Loan.*** While the evidence regarding the Subsequent Small Wilshire Loan (mentioned in the paragraph above) was spotty at best (Ex. I, p. 43), it was not spotty that on March 12, 2007, Prosper for the first time made a loan (a $300,000 loan) to A&S and, in consideration for that, ***A&S executed a Deed of Trust granting a security interest in Lot 3A to Prosper Bank***. Ex. I, pp. 42 & 61. Ex. I references prior encumbrances already on the land (Lot 3A) due to a $1,600,000 note dated March 23, 2005 (obviously, a reference to the Wilshire/SBA Loan) and a $105,000 note dated November 3, 2006. Ex. I, p. 43 (presumably the Subsequent Small Wilshire Loan mentioned in the paragraph above). This new Prosper deed of trust was recorded on April 5, 2007.

18. ***Prosper Increases Its Stake by Taking an Assignment of the Wilshire/SBA Loan and Lien.***  On April 10, 2007, shortly after making its new $300,000 Loan to A&S, the Wilshire/SBA Loan of March 23, 2005 was assigned or transferred to Prosper Bank.  Ex. G.  The "Transfer of Lien" that evidences this assignment appears to be dated April 10, 2007 (the date "March __, 2007" was actually typed on the document, but someone hand-struck March and handwrote in "April 10" (without initialing the change)).  The document evidencing this assignment was recorded on June 14, 2007 at 12:15 p.m.  Ex. G, p. 37.

F.  Comerica Lawsuit.

19.  On July 24, 2008, Comerica sued Sash and the Hwangs on the Comerica Note and Guaranties.

20.  Then, on December 8, 2008, Comerica obtained a $979,779.87 joint and several judgment against Sash and the Hwangs.  Ex. 1.

21.  Shortly thereafter, on January 14, 2009, Comerica filed an Abstract of Judgment in the Dallas County Public Records, imposing a lien on whatever real property the Hwangs owned in Dallas County.  Ex. 2.

22.  As the Hwangs technically still owned Lot 3 (although allegedly "replatted" into a "Lot 3A"), the Abstract of Judgment lien held by Comerica would have attached to Lot 3 at the time of the filing of the Abstract of Judgment on January 14, 2009.

23. On July 22, 2010, Mr. Hwang filed bankruptcy.

24. Prosper has not argued any superior lien rights in Lot 3 (or Lot 3A) by virtue of the $105,000 or $300,000 loans mentioned in paragraphs 16 and 17 above. Rather, Prosper argues that it is entitled to be "equitably subrogated" to the past lien in Lot 3 **held by UCB** that UCB recorded in January 2000 in relation to the December 1999 UCB Loan. Why? Because, allegedly, $175,159.96 of the proceeds of the $1,600,000 Wilshire/SBA Loan were used to pay off the unpaid balance on the UCB Loan owed by the Hwangs. This, according to Prosper, was grounds for **Wilshire** to equitably subrogate itself to the UCB liens in the Hwangs' property (in Lots 3 and 4). And **Prosper** now stands in the shoes of **Wilshire**. *See* Ex. G. This equitable subrogation theory would apply, according to Prosper, even though Wilshire **only obtained liens in Lots 4, 5, and 6 in connection with its $1,600,000 loan**. Prosper acknowledges that it does not know if a mistake was made by Wilshire or not (in only obtaining a deed of trust that covered Lots 4, 5, and 6 and in only arranging for the Hwangs to make a conveyance to A&S of Lots 4, 5, and 6). But according to Prosper, it does not matter if a mistake was made in the documentation or not. Prosper argues that the doctrine of equitable subrogation would apply here and would allow Prosper (as assignee) to have a superior right in the Lot 3 portion of Lot 3A to Comerica.

## III. CONCLUSIONS OF LAW

A. This court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1334(b).

B. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K).

C. Comerica is a proper party in interest and before this court as a defendant.[5]

D. The court concludes that Prosper is **not** entitled to be equitably subrogated to the past lien of UCB on Lot 3 (or any other past lien in Lot 3, for that matter).

E. The lien held by Comerica on Lot 3 is superior to any claim held by Prosper.

E. Comerica is entitled to foreclose on its lien on Lot 3.

F. "Equitable subrogation" is a "legal fiction" recognized on occasion by Texas courts "whereby an obligation, extinguished by a payment made by a third person, is treated as still subsisting for the benefit of this third person, so that by means of it one creditor is substituted to the rights, remedies, and securities of another." *Murray v. The Cadle Company,* 257 S.W.3d 291, 299 (Tex. App.–Dallas 2008). It essentially allows a subsequent lienholder to take the lien-priority status of a prior

---

[5] Earlier during this Adversary Proceeding, there were disputes concerning whether Comerica had been properly named as a Defendant, but such disputes have since been resolved.

lienholder. *Bank of Am. v. Babu,* 2011 WL 1648241, at *6 (Tex. App.–Dallas May 3, 2011, no pet.) (citations omitted). The general purpose is to prevent unjust enrichment to the debtor. *Id.* The doctrine does not depend upon a contract, but arises in every instance in which one person, not acting voluntarily, has paid a debt for which another is primarily liable and which in equity should have been paid by the latter. *Id.* at *7.

    G. "There are two key elements to equitable subrogation: (1) the person whose debt was paid was primarily liable on the debt, and (2) the claimant paid the debt involuntarily." *Id.*

    H. Here, Prosper urges that it should be allowed to take the lien-priority status that UCB enjoyed, as to Lot 3, since, allegedly, $175,159.96 of the proceeds of the $1,600,000 Wilshire/SBA Loan were used to pay off UCB and UCB, of course, had a lien in Lots 3 and 4.

    I. The burden of proof is on the one claiming equitable subrogation. *Id.*

    J. The court concludes that Prosper did not meet its burden of showing its entitlement to equitable subrogation, because it did not establish that its predecessor, Wilshire, in fact paid off the $175,159.96 debt then-owing by the Hwangs to UCB. The only proof of this (Ex. D) is not credible or persuasive evidence. The attachment to Ex. D (even if fully credible) shows a payment on **May 19, 2006**—approximately 14 months after the

-12-

Wilshire/SBA Loan was made.  The payment is to **Tony's Beer & Wine** (not to UCB and not to the Hwangs).  The Wilshire/SBA Loan documentation indicated it was for construction purposes and "to discharge **corporate** debts."  Ex. C, p. 14 (emphasis added). There is simply no credible, compelling evidence that proceeds of the Wilshire/SBA Loan were used to pay off the UCB Loan such that there could be subrogation of Wilshire (much less Prosper) to the UCB lien position.

K.  Additionally, even if there were not this very large proof problem, the court concludes that there are additional legal obstacles to applying the doctrine of "equitable subrogation" here.  For one thing, the court perceives a problem with the "involuntariness" of Wilshire's actions in 2005 (assuming that part of the proceeds of the Wilshire/SBA Loan were, in fact, used to extinguish the UCB Loan).  A "volunteer" in this context has been defined as one who has paid a debt of another, without any assignment or agreement of subrogation, without being under any legal obligation to make payment, and without being compelled to do so for the preservation of any rights or property of his own.  *Frymire Eng'g Co., Inc. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 145 (Tex. 2008).  While Texas courts tend to be liberal in their determinations as to when payments are made "involuntarily," the fact is that the equitable subrogation doctrine is most often applied in the context of a

-13-

surety, when a party is protecting its own interest from being jeopardized, or to otherwise prevent what would be an unjust enrichment to a debtor. *Id.* This court is doubtful that Prosper (who took an assignment from Wilshire) is **not** a "volunteer." It is legally questionable that **Wilshire** should be deemed to have paid the UCB Loan balance involuntarily. It is even more of a stretch to treat Prosper as not a volunteer, when it took an assignment from Wilshire, having every reason to know of Wilshire's "mistake" or "defect" with regard to having a perfected lien in Lot 3.

L.  A trial court must balance the equities in view of the totality of the circumstances to determine whether a party is entitled to equitable subrogation. *Murray*, 257 S.W.3d at 300. What the parties knew and intended are all relevant factors in balancing the equities involved in the case. *See id.* Here, there is no evidence at all to enlighten the court as to what the parties knew and intended. This militates against applying equitable subrogation. Again, Prosper had the burden of proof on equitable subrogation, and it has presented no evidence that the parties intended for Wilshire to receive a lien on Lot 3.

M.  Finally, the court notes that equitable subrogation cannot be imposed against a good faith purchaser. *First State Bank of Amarillo v. Jones*, 183 S.W. 874, 876 (Tex. 1916). While a judgment lien holder (such as Comerica) would not be considered

-14-

a good faith purchaser itself (*id.*), ***a Chapter 7 Trustee***, pursuant to Section 544(a)(3) of the Bankruptcy Code, ***does*** stand in the shoes of a good faith purchaser as to real property.  This means that the estate/Trustee would defeat any argument of equitable subrogation by Prosper.  While it is true that the Trustee in this case has not taken a position in this Adversary Proceeding, it occurs to the court that the legal analysis here works something like the game of "rock, paper, scissors" that we all learned in childhood.  In other words, outside of bankruptcy court, Prosper (if not for (a) its evidentiary problems and (b) its "voluntary" problem) might defeat Comerica on the equitable subrogation theory.  Scissors (Prosper) beats paper (Comerica).  But in the context of a bankruptcy case, the Trustee (the Rock) would defeat Prosper (the Scissors) on the equitable subrogation theory (because of his status as a good faith purchaser *vis-a-vis* Lot 3).  Once the Trustee defeats the equitable subrogation theory of Prosper, then Comerica (the Paper) would be in a position to assert its rights as a secured creditor in the bankruptcy case, *vis-a-vis* Lot 3, by virtue of the Abstract of Judgment (which the court notes was perfected safely before the preference period).  Thus, Comerica (the Paper) would defeat the Trustee (the Rock).  Thus, Comerica would appear to prevail in the "rocks, paper, scissors" contest that occurs in the bankruptcy context.  The court notes that none of the authority

that Prosper cited to the court regarding equitable subrogation was case law in the context of a bankruptcy case. This court believes that equitable subrogation has limited application in the world of bankruptcy.[6]

A separate JUDGMENT shall be issued consistent with these Findings of Fact and Conclusions of Law.

*** * * * END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW * * * ***

---

[6] The court acknowledges that the Trustee, in this case, has not taken any position in the Adversary Proceeding and has not filed any separate adversary proceeding to "avoid" Prosper's alleged equitable lien in Lot 3. The court also acknowledges that Mr. Hwang did not schedule Lot 3 in his Bankruptcy Schedules. However, the court does not believe that either of these facts are ultimately relevant. First, the parties stipulated that the Hwangs never conveyed Lot 3 (they only replatted it). Thus, Lot 3 was still the Hwangs' property, and thus "property of the estate," whether Mr. Hwang scheduled it or not. *See* 11 U.S.C. § 541. Moreover, the Trustee, in this no-cash estate, likely recognized that there was no equity for the estate as to Lot 3 (in other words, he likely recognized that it would be Prosper or Comerica who, at the end of the day, would be entitled to the value in Lot 3). Bottom line, since "equitable subrogation" is (obviously) an equitable remedy, the court thinks that it makes sense, in balancing the equities, to think through the implications of Section 544 of the Bankruptcy Code as to Prosper, even though the Trustee has not actually utilized the "strong arm" provisions of Section 544 of the Bankruptcy Code. Thus, since the Trustee would trump Prosper, under Section 544 of the Bankruptcy Code, and Comerica would trump the Trustee (as a holder of a valid, perfected, unavoidable lien in Lot 3), there is no equitable reason to apply equitable subrogation here.